BENTON, Circuit Judge.
Following a bench trial, the district court[1] entered judgment for Myers Supply, Inc. on Georgia-Pacific Consumer Products LP’s claim for contributory trademark infringement. Earlier, the district court granted summary judgment to Myers, on Georgia-Pacific’s claim for tortious interference with contractual relationship. Georgia-Pacific appeals. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.
I.
Georgia-Pacific manufactures paper-towel dispensers and disposable paper towels. In 2002, it introduced a touch-less paper-towel dispenser, “enMotion.” The enMotion dispenser displays federally registered enMotion and Georgia-Pacific trademarks. Georgia-Pacific also makes a 10-inch-wide, paper-towel roll for use in the enMotion dispenser. The towels have no trademarks printed on them. The packaging, however, clearly identifies Georgia-Pacific as the manufacturer.
Georgia-Pacific considers the enMotion a “proprietary” dispenser. Georgia-Pacific does not sell the enMotions, but leases them to distributors. From the distributor, Georgia-Pacific receives a small initial payment and seeks to profit from paper-towel sales for the dispensers. Distributors may sublease the dispensers at prices they choose. The distributor is supposed to require sublessees to fill the dispenser with Georgia-Pacific towels. Whether or not the distributor makes an agreement with the sublessee, a sticker and warranty card inside the dispensers state that only Georgia-Pacific towels may be used.
Georgia-Pacific also manufactures “universal” towel dispensers — non-proprietary dispensers also bearing Georgia-Pacific trademarks. It is common practice in the industry, and not improper, to put one brand of towels in an unleased, universal dispenser displaying a different manufacturer’s trademarks. Georgia-Pacific sells towels for use in other manufacturers’ trademarked dispensers; its catalogue suggests towels that replace other manufacturers’ towels.
In 2003, Georgia-Pacific leased enMotion dispensers to one of its distributors, Brown Janitorial Supply. Brown distributed the enMotion dispensers to business and not-for-profit entities, including a Baptist church and a school district — the end-users. Myers, the defendant in this case, is also a distributor of other paper-towels and paper-towel dispensers. In 2007, Myers began selling a 10-inch-wide paper towel manufactured by von Drehle Corporation, the “810-B towel,” which works in the enMotion dispensers. At that time, the enMotion was the only. 10-inch dispenser widely available. Myers knew “with 99 percent” certainty that the 810-B towels would be used in enMotion dispensers. The 810-B towels are less expensive than enMotion towels and have a paper- *774 like, “crinkly” feel, unlike the more cloth-like feel of enMotion towels. The packaging on the 810-B towels clearly identifies von Drehle as the manufacturer, although the towels themselves have no identifying marks. Because of the packaging on the von Drehle (and Georgia-Pacific) towels, purchasers have no uncertainty about the source of the towels. The purchaser decides what kind of towel to use, actually loading them into the dispensers.
Myers sold 810-B towels to the Baptist church and the school district. Georgia-Pacific sent Myers a cease-and-desist letter stating that enMotion dispensers are property of Georgia-Pacific and subject to lease and sublease agreements. Georgia-Pacific accused Myers of trademark infringement and tortious interference with Georgia-Pacific’s distributors and the end-user purchasers. In reply, Myers demanded evidence of signed subleases and continued selling the 810-B towels. Georgia-Pacific did not provide Myers with subleases containing a towel-use restriction signed by the Baptist church or school district. The evidence presented at the district court includes duplicates of the front side of what Georgia-Pacific claims to be sublease agreements between Brown and the Baptist church, and the school district. Also in evidence is the back side of a sample sublease that Georgia-Pacific claims is the back side of all sublease agreements. The sample sublease requires the sublessee to use only Georgia-Pacific towels in subleased Georgia-Pacific dispensers. Georgia-Pacific did not produce subleases containing a towel-use restriction signed by the Baptists church or the school district.
Georgia-Pacific claims that Myers committed contributory trademark infringement by selling 810-B towels knowing that they would be placed in enMotion dispensers. Georgia-Pacific also contends that Myers’s actions constitute tortious interference with the contracts requiring end-users to use Georgia-Pacific paper towels in enMotion dispensers. After a bench trial, the district court ruled for Myers on the contributory infringement claim, finding no likelihood of confusion by consumers. The district court had earlier granted summary judgment against Georgia-Pacific on the tortious interference claim, finding that Georgia-Pacific could not prove that Myers intentionally caused the end-users to breach sublease agreements, or that its conduct was improper.
II.
To prove contributory infringement, Georgia-Pacific must establish that Myers continued to supply towels to its customers with knowledge that they were engaging in trademark infringement with the paper towels. See Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 854, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). Because there is no dispute that Myers knew that its customers were putting 810-B towels in enMotion dispensers, the district court’s only consideration was whether this infringed Georgia-Pacific’s trademarks.
To establish actual infringement under the Lanham Act, a mark must be used in commerce in connection with a product in a manner that is likely to cause confusion as to the source or sponsorship of the product. 15 U.S.C. § 1125(a)(1)(A). The issue is whether the trademarks on a towel dispenser are “source-identifying,” meaning they identify the source of the paper towels inside, so that putting von Drehle’s 810-B towels in the enMotion dispenser creates a likelihood of confusion as to the brand of the towels. The district court found no likelihood that purchasers or consumers would be confused and believe that the trademark on the dispenser indicates the source of the towels inside. *775 This court reviews the district court’s determination of likelihood of confusion, which is a question of fact, for clear error. Kemp v. Bumble Bee Seafoods, Inc., 398 F.3d 1049, 1053-54 (8th Cir.2005). If there are two permissible views of the evidence, “the fact-finder’s choice between them cannot be clearly erroneous.” Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).
To determine a likelihood of confusion, this court considers six factors: 1) the strength of the plaintiffs mark; 2) the similarity between the plaintiffs mark and the alleged infringing mark; 3) the degree to which the allegedly infringing product competes with the plaintiffs goods; 4) the alleged infringer’s intent to confuse the public; 5) the degree of care reasonably expected of potential customers; and 6) evidence of actual confusion. Davis v. Walt Disney Co., 430 F.3d 901, 903 (8th Cir.2005), citing SquirtCo v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir.1980). Each case is unique, and the factors are useful only to the extent they answer the ultimate question — in this case, whether a trademark on a towel dispenser is source-identifying for the towels inside.
First, the district court found that Georgia-Pacific’s trademarks are strong. Second, it found that because the von Drehle marks are not visible once the 810-B towels are put in an enMotion dispenser, the second factor is neutral. Third, the court found that the von Drehle 810-B competes directly with the enMotion towel. Fourth, relying on testimony that it was common in the industry to “stuff one brand of towel in a dispenser of a different brand, the district court found no intent to confuse the public, by either the end-users or Myers. Fifth, the court found a low degree of care by bathroom consumers. While this normally favors the plaintiff, the district court stated that here, this lack of care shows that the marks on a dispenser do not identify the source of the towels inside. The court also found that the end-users have a high-degree of care, and are fully aware of the source of the towels they purchase.
Finally, the district court found that there was no actual confusion in the marketplace. The court examined the experiences of both the end-user and the bathroom consumer, focusing on the latter. As mentioned, the end-users are fully aware of the brand of towel they stuff into their dispensers, thus there is no actual confusion as to the source of the towel — a determination unchallenged by Georgia-Pacific. In deciding that there was no actual confusion by bathroom consumers, the court considered the consumer-surveys submitted by both sides, but relied more on the general industry practice of stuffing unleased dispensers with other company’s towels.
Georgia-Pacific contends that the district court abused its discretion in discounting consumer-surveys it claims show a likelihood of confusion by bathroom consumers. Georgia-Pacific invokes the recent Fourth Circuit decision in Georgia Pacific Consumer Products, LP v. Von Drehle Corp., 618 F.3d 441, 2010 WL 3155646 (4th Cir.2010). In that case, the Fourth Circuit reversed a grant of summary judgment, resuscitating Georgia-Pacific’s claim of contributory trademark infringement against von Drehle. According to the Fourth Circuit, the district court erred as a matter of law by not examining the likelihood of confusion among bathroom consumers when determining the overall likelihood of confusion. Significantly, the Fourth Circuit rendered no opinion whether Georgia-Pacific had proven a likelihood of confusion by bathroom consumers. Rather, it held only that the *776 evidence offered by Georgia-Pacific — the same consumer-surveys presented in this circuit — created a genuine issue of material fact as to the likelihood of confusion, remanding the case for trial.
The district court here, like the Fourth Circuit, denied summary judgment; it held a bench trial. Considering all the facts, including the consumer-surveys, the district court found no likelihood of confusion. Because the court here fully considered the evidence relating to confusion by bathroom consumers, the Fourth Circuit’s decision is not helpful in this case.
At trial, Georgia-Pacific presented the testimony and consumer survey of Dr. Eli Seggev. Survey participants washed their hands and then dried them with an enMotion towel from an enMotion dispenser bearing its trademarks. Asked the source of the towels, 28 percent answered that they thought the brand of the towel was the same as the brand of the dispenser. Kenneth A. Hollander provided expert testimony for Myers, critiquing the methodology of the Seggev survey, and discussing his own consumer survey. According to the Hollander survey, 11.4% of respondents almost always thought that the brand on the dispenser was the same as the towels, and 36.5% thought they were sometimes the same.
After hearing the testimony of Dr. Seggev and Mr. Hollander, the district court found that there were several methodological problems with the Seggev survey, including the artificial environment, the leading nature of the questions, and the lack of a control. Most importantly, the court, after a thorough discussion, found that the entire premise of the survey was flawed, as this type of survey helps determine the likelihood of confusion between two marks, not whether a mark on one product is source-identifying of a complementary unmarked product. Because this type of survey presupposes that the mark in question is source-identifying, the court found the probative value of the survey to be severely limited.
Georgia-Pacific contends that even with the Seggev survey discounted, the Hollander survey, by itself, establishes a likelihood of confusion, and that the district court clearly erred by finding no likelihood of confusion. See Anheuser-Busch, Inc. v. Balducci Publications, 28 F.3d 769, 775 (8th Cir.1994) (survey showing 6% of respondents thought a spoof was an actual Anheuser-Busch advertisement and over 50% thought Anheuser-Busch approved it, was strong indication of consumer confusion); Mutual of Omaha v. Novak, 836 F.2d 397, 400 (8th Cir.1987) (survey showing 10% thought Mutual of Omaha “goes along” with Novak’s product was strong evidence of likelihood of confusion); James Burrough, Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266, 279 (7th Cir.1976) (survey showing 15% confusion was sufficient).
While the district court noted that the Hollander survey’s 11.4% was a small number, it did not find a lack of confusion by bathroom consumers solely on that basis. The court found more probative the non-expert testimony of industry insiders that consistently showed it was unobjectionable and common practice to put towels of one brand into a dispenser of a different brand. Highly relevant was the testimony of Georgia-Pacific’s own regional manager reiterating that it was acceptable practice to place towels of one brand in an unleased dispenser bearing the marks of a different brand. Further evidence is Georgia-Pacific’s own catalogue, which suggests replacement towels for other manufacturers’ towels, including other manufacturers’ controlled brands. Georgia-Pacific argues that this testimony only related to dispensers that were unleased, not to dispensers like the enMotion. This *777 argument is undermined by Georgia-Pacific’s own practices. Whether or not a towel dispenser is leased has no bearing on the actual confusion by the bathroom consumer; there is no evidence that bathroom consumers of towel dispensers know whether the dispenser they are using is leased or unleased.
The district court did not abuse its discretion in discounting the survey evidence and crediting more the testimony from industry insiders, and thus correctly determined that there is no actual confusion by bathroom consumers. Nor did the court clearly err in finding that the trademark on a dispenser does not indicate the source of the paper towels inside, and concluding that there was no likelihood of confusion, and thus no trademark infringement.
III.
Georgia-Pacific argues that the district court erred in dismissing on summary judgment its claim for tortious interference with contractual relationship. A grant of summary judgment is reviewed de novo. IESI AR Corp. v. Nw. Ark. Reg’l Solid Waste Mgmt. Dist., 433 F.3d 600, 603 (8th Cir.2006). Summary judgment is appropriate if the evidence, viewed most favorably to the nonmovant, shows no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c)(2).
Under Arkansas law, a claim for tortious interference with contractual relationship has five elements: (1) the existence of a valid contractual relationship; (2) the defendant’s knowledge of the relationship; (3) intentional interference inducing or causing a breach of the relationship by the defendant; (4) damage to the party whose relationship has been disrupted; and (5) improper conduct by the defendant. Vowell v. Fairfield Bay Cmty. Club, Inc., 346 Ark. 270, 58 S.W.3d 324, 329 (2001).
The district court determined that Georgia-Pacific could not establish the elements of intentional interference and improper conduct. It did not address whether Georgia-Pacific could establish the existence of a valid sublease between Brown and the Baptist church or the school district (of which Georgia-Pacific claims to be a third-party beneficiary), or Myers’s knowledge of such a sublease. These are close questions as no signed sublease with the towel restriction was produced.[2] Additionally, Georgia-Pacific was not consistent in obtaining signed subleases or explaining the towel-use restriction to end-users. This task was left to distributors like Brown. Its representative testified that he could not remember telling the Baptist church or the school district that they were required to use Georgia-Pacific towels in the enMotion dispensers. Further, before the sales to the church and school district, Georgia-Pacific’s management was concerned that agreements were not being signed by end-users. After Georgia-Pacific sent the cease-and-desist letter, Myers began asking customers ordering 810-B towels if they had sublease agreements. No customer stated that it had a sublease.
This court, however, need not decide whether a valid contract existed or whether Myers knew of one because the evidence shows that Myers’s conduct was not improper. In determining whether an actor’s conduct is improper, the court should consider “(1) the nature of the actor’s conduct; (2) the actor’s motive; (3) *778 the interests of the other with which the actor’s conduct interferes; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (6) the proximity or remoteness of the actor’s conduct to the interference; and (7) the relations between the parties.” Baptist Health v. Murphy, 365 Ark. 115, 226 S.W.3d 800, 809 (2006), citing Restatement (Second) of Torts § 767 (1979). See also Vowell, 58 S.W.3d at 329 (“We have considered the factors outlined in the Restatement ... for guidance about what is improper.”).
According to the Restatement, the nature of the actor’s conduct is a chief factor in determining whether conduct is improper. The Restatement lists examples of ways an actor can cause interference, suggesting that depending on the circumstances, some ways are more likely to indicate improper conduct. Restatement (Second) of Torts § 767 cmt. c (1979). As examples, the Restatement lists physical violence, misrepresentations, threats of civil suit made in bad faith, threats of criminal prosecution made in bad faith, conduct in violation of statute, economic pressure, and violation of business customs. Id.
In this case, the nature of Myers’s conduct indicates that it did not act improperly. As the district court found, Georgia-Pacific failed to offer sufficient evidence that Myers did anything other than sell towels to its customers. See K.C. Props. of N.W. Ark., Inc. v. Lowell Inv. Partners, LLC, 373 Ark. 14, 280 S.W.3d 1, 12 (2008) (affirming summary judgment because appellant failed to “provide specific facts or evidence” of improper conduct). Georgia-Pacific agrees that the sale of 810-B towels for use other than in a leased enMotion dispenser is unobjectionable, and that the end-users’ purchase of the 810-B towel does not breach the sublease agreement. Rather, Georgia-Pacific contests only the end-users’ act of placing 810-B towels in enMotion dispensers (as Myers does not itself put 810-B towels in enMotion dispensers). Georgia-Pacific concedes that it is a common and acceptable practice in the industry to put a different brand of towel in an unleased dispenser bearing another manufacturer’s trademarks. This is important, because if there was no sublease requiring the use of Georgia-Pacific towels, then it is acceptable to put 810-B towels in the enMotion dispensers. And while Myers knew with 99 percent certainty that its customers were putting 810-B towels in enMotion dispensers, the evidence does not show that Myers knew they were doing so in violation of a sublease. At trial, Ryan Myers acknowledged that in 2007 and 2008 there was a “99 percent” probability that customers buying 810-B towels were placing them in enMotion dispensers. There is, however, no evidence in the record that Myers knew that the towels were being placed in leased dispensers. Myers attempted to confirm Georgia-Pacific’s cease-and-desist allegations by asking Georgia-Pacific for signed subleases. Georgia-Pacific never provided any. Additionally, Myers asked its customers whether they had sublease agreements with Georgia-Pacific, and none stated they did.
Other factors also weigh in favor of Myers. Georgia-Pacific has not suggested that Myers was motivated by any desire other than to fill the orders of its customers. Significantly, Myers explained, and Georgia Pacific has not refuted, that it was the Baptist church that approached Myers looking for towels to put in the enMotion dispensers. Georgia-Pacific’s interest was to sell its towels to the end-users of the enMotion dispensers; Myers’s interest was to sell towels to its customers. As the *779 district court said, society has an interest in promoting competition without burdening a seller with controlling its customers’ uses of goods. Myers’s sale of 810-B towels to end-users is remote to the breach of any alleged sublease agreement because the purchase of 810-B towels did not breach a sublease. Rather, any breach resulted from using the 810-B towels in a leased enMotion dispenser.
Based on the record, the Baptist church and the school district could, at any time, return the dispensers, terminating the sublease; in fact, the church replaced the enMotion dispensers with a Bay West product. Similarly, Georgia-Pacific could, for any reason, repossess a leased dispenser. The agreement between Brown and the end-users was for an indefinite term and thus was an at-will contract. See Griffin v. Erickson, 277 Ark. 433, 642 S.W.2d 308, 310 (1982) (explaining that an employment contract for an indefinite term is a “contract at will.”). Under Arkansas law, there is a strong presumption that interference with an at-will contract is not improper. See Restatement (Second) of Torts § 768 (1979) (interfering with a contract that is terminable at will is less likely to be improper); Mathis v. Liu, 276 F.3d 1027, 1030 (8th Cir.2002) (emphasizing that interference with an at-will contract is less likely to be improper because it concerns future, not present, business relationships); Mason v. Wal-Mart Stores, Inc., 333 Ark. 3, 969 S.W.2d 160 (1998) (affirming summary judgment for Wal-Mart, noting that its conduct was not improper where appellant, an at-will sales representative, was fired after Wal-Mart announced it would no longer deal with vendors who had independent sales representatives).
“[T]he real question is whether the actor’s conduct was fair and reasonable under the circumstances.” Hayes v. Advanced Towing Servs., Inc., 73 Ark. App. 36, 40 S.W.3d 800, 805 (2001) citing Restatement (Second) of Torts § 767 cmt. j (1979). Georgia-Pacific has offered no specific facts or evidence to demonstrate that Myers’s conduct was unfair or unreasonable. See K.C. Props, of N.W. Ark, Inc. v. Lowell Inv. Partners, LLC, 373 Ark. 14, 280 S.W.3d 1, 12 (2008) (affirming summary judgment because appellant failed to “provide specific facts or evidence” of improper conduct). Accordingly, the district court did not err in granting Myers’s motion for summary judgment on Georgia-Pacific’s tortious interference claim.
IV.
The judgment of the district court is affirmed.

. The Honorable Robert T. Dawson, United States District Judge for the Western District of Arkansas.

. The Fourth Circuit, examining similar facts, stated that "the record cannot support a finding that G-P had contractual relationships with the end-user customers.” Georgia Pacific Consumer Products, LP, 2010 WL 3155646, at *14.